

FILED

7/9/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

LM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 1:25-cr-00382<br>JUDGE JENKINS |
| v. | No. MAGISTRATE JUDGE VALDEZ<br>RANDOM/Cat.3 |
| GEORGE KAVROULAKIS,<br>ATHANASIOS INTZES, a/k/a "Tommy,"<br>ADAM JABER,<br>HASSAN KURDI, and<br>ABDALLAH ISSA | Violation: Title 18, United States<br>Code, Section 1343<br><br>**UNDERSEAL** |

**COUNTS ONE THROUGH SIXTEEN**

The SPECIAL APRIL 2024 GRAND JURY charges that:

1.     At times material to this indictment:

### *The Small Business Administration*

a.     The U.S. Small Business Administration ("SBA") was a United States government agency that provided economic support to small businesses.

### *The Paycheck Protection Program*

b.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

c.     One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses and sole proprietors for job retention and certain other expenses, through a program called

the Paycheck Protection Program ("PPP"). Congress subsequently authorized an additional $465 billion in funding for PPP loans, for a total of about $814 billion.

        d.    To obtain a PPP loan, a business, sole proprietor, or self-employed individual submitted a PPP loan application, which was signed by the applicant or an authorized representative of the business. The PPP loan application required the applicants to acknowledge the program rules and make certain affirmative certifications regarding the eligibility of the business, proprietorship, or individual. In the application, businesses, sole proprietors, and self-employed individuals were required to provide, among other things, their number of employees and average monthly payroll or gross income. These figures were used to calculate the applicant's eligibility and the amount of money the sole proprietor, self-employed individual, or business could receive under the PPP. Applicants were also required to make good faith certifications, including that the business entity was in operation on February 15, 2020, and that economic uncertainties had necessitated their loan requests for continued business operations.

        e.    To gain access to funds through the PPP, businesses, sole proprietorships, and self-employed individuals applied to lenders participating in the PPP and, if approved, received the loans from those lenders, either directly or through loan service providers.

        f.    Businesses, sole proprietors, and self-employed individuals that obtained PPP loans and used the full loan amount were allowed to obtain additional

funds through the PPP by submitting a Second Draw Borrower Application Form ("Second Draw Application"), which was signed by the applicant or an authorized representative of the business. The Second Draw Application required the applicants to again acknowledge the program rules and make certain affirmative certifications regarding the eligibility of the business, and again provide their number of employees and average monthly payroll or gross income. These figures were again used to calculate the applicant's eligibility and the amount of money the business could receive under the PPP. Applicants were again required to make good faith certifications, including that economic uncertainties had necessitated their loan requests for continued business operations and that the applicants had used the full amount of the initial PPP loan only for eligible expenses.

g. Participating lenders, loan service providers, and the SBA required applicants for PPP loans to provide truthful information about the sole proprietorship, self-employed individual, or business and its owner, including truthful information about the applicant's Social Security Number, payroll, income, operating expenses, and how the PPP loan would be used, which information was material to (i) lenders' approval, terms, and funding of loans and (ii) the SBA's decision to guarantee the loans.

### The Economic Injury Disaster Loan Program

h. Another source of relief provided by the CARES Act and other pandemic-relief legislation was the expansion of the Economic Injury Disaster Loan

3

("EIDL") Program, which provided loan assistance (including advances of up to $10,000) for businesses with 500 or fewer employees and other eligible entities. The EIDL Program was designed to provide economic relief to small businesses that were experiencing a temporary loss of revenue.

       i.    To gain access to funds through the EIDL Program, small businesses applied through the SBA via an online portal and application. As part of the EIDL application process, the SBA required applicants to submit truthful information about the applying entity, its owner, and its financial condition prior to the COVID-19 pandemic. This information included the entity's number of employees as of January 31, 2020; the entity's gross revenues and cost of goods sold for the 12-month period prior to January 31, 2020; and the entity's type of business (i.e., a business, an agricultural business, a sole proprietorship, a cooperative, among others); the date on which the business opened; and the date on which the current owner assumed ownership of the entity. Applicants were required to electronically certify that the information provided in the application was true and correct and were warned that a false statement or misrepresentation to the SBA may result in sanctions, including criminal penalties.

       j.    The SBA required applicants for EIDL loans to provide truthful information about the sole proprietorship, self-employed individual, or business and its owner, including truthful information about the applicant's number of employees,

costs of goods sold, and gross revenues, which information was material to the SBA's approval, terms, and funding of loans.

k.     EIDL funds were issued to small-business applicants directly from the United States Treasury.

l.     EIDL Advance was a grant program offered together with the EIDL Program. EIDL Advance was designed to provide emergency economic relief to businesses that were experiencing a temporary loss of revenue as a result of the COVID-19 pandemic. The applicant could request consideration for an EIDL advance in an application for an EIDL loan. The amount of the advance issued to the small-business applicant was determined by the number of employees indicated on the EIDL application, at $1,000 per employee, up to $10,000. The number of employees reported by the business was material to the SBA's funding of an EIDL Advance and determination of the amount of the EIDL Advance. If an EIDL advance was issued, the advance did not need to be repaid.

m.     If an EIDL application was approved by the SBA, the amount of the EIDL loan was determined in part based on the statements in the EIDL application about the entity's revenues and cost of goods sold for the 12 months prior to January 31, 2020.

n.     EIDL loan funds could be used to pay for the ordinary operating expenses and debts of the entity, including payroll, sick leave, production costs,

utilities, rent, mortgage payments, continuation of health care benefits, and fixed debt payments.

*Individuals*

o.      Defendant GEORGE KAVROULAKIS was a resident of the Northern District of Illinois.

p.      Defendant ATHANASIOS INTZES, a/k/a "Tommy," was a resident of the Northern District of Illinois. INTZES was the registered agent of Thanasis Exotic Rentals Inc, which was incorporated in Illinois on or about August 10, 2020.

q.      Defendant ADAM JABER was a resident of the Northern District of Illinois. JABER was the registered agent of Jaber Wholesale, Inc., which was incorporated in Illinois on or about August 14, 2020.

r.      Defendant HASSAN KURDI was a resident of the Northern District of Illinois.

s.      Defendant ABDALLAH ISSA was a resident of the Northern District of Illinois. ISSA was the registered agent of Second Road, Inc., which was incorporated in Illinois on or about June 14, 2019.

*Loan Service Providers*

t.      Bluevine Inc. was a financial technology company which processed PPP applications on behalf of financial institutions, including Cross River Bank.

6

      u.     Blueacorn was a financial technology company which processed PPP applications on behalf of financial institutions, including Capital Plus Financial and Prestamos, CDFI, LCC.

      v.     Bluevine Inc. and Blueacorn are together, the "Loan Service Providers."

### Lenders

      w.     Itria Ventures was a financial technology company which processed PPP applications and funded PPP loans to approved borrowers.

      x.     Capital Plus Financial was a financial technology company which processed PPP applications and funded PPP loans to approved borrowers.

      y.     Cross River Bank was a FDIC-insured financial institution which funded PPP loans to approved borrowers.

      z.     Prestamos CDFI, LLC was a community development financial institution which funded PPP loans to approved borrowers.

      aa.     Itria Ventures, Capital Plus Financial, Cross River Bank, and Prestamos CDFI, LLC are together, the "Lenders."

### The Scheme to Defraud

    2.     Beginning in or around May 2020 and continuing through in or around August 2021, in the Northern District of Illinois, and elsewhere,

GEORGE KAVROULAKIS,
ATHANASIOS INTZES, a/k/a "Tommy,"
ADAM JABER,

7

HASSAN KURDI, and
ABDALLAH ISSA,

defendants herein, together with others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud, and to obtain money and property, in connection with applications for PPP and EIDL funds, by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3.      It was part of the scheme that defendants GEORGE KAVROULAKIS, ATHANASIOS INTZES, a/k/a "Tommy," ADAM JABER, HASSAN KURDI, ABDALLAH ISSA, and others for the purpose of fraudulently obtaining millions of dollars in PPP and EIDL funds, submitted, and caused to be submitted to Loan Service Providers, Lenders, and the SBA, dozens of loans and advance applications under the PPP and EIDL Programs, on behalf of businesses and entities purportedly owned and operated by the defendants and others, including on behalf of purported businesses and other entities, which defendants knew contained materially false statements and misrepresentations concerning, among other things, the purported entities' number of employees, gross income, gross revenues, payroll, cost of goods sold, operating expenses, type of business, and existence as companies with ongoing operations.

4.      It was further part of the scheme that defendants knowingly caused false and fraudulent PPP and EIDL loan applications, and supporting

documentation, to be submitted on behalf of dozens of purported businesses and entities, which in some cases, defendants themselves purported to operate, including the following:

        a.      GEORGE KAVROULAKIS, a purported sole proprietor;

        b.      ADAM JABER, a purported sole proprietor;

        c.      HASSAN KURDI, a purported sole proprietor;

        d.      ATHANASIOS INTZES, a purported sole proprietor;

        e.      Individual K.K., a purported sole proprietor;

        f.      Individual E.G., a purported sole proprietor;

        g.      Individual M.A., a purported sole proprietor;

        h.      Individual D.P., a purported sole proprietor;

        i.      Individual V.M., a purported sole proprietor;

        j.      Individual S.M., a purported sole proprietor;

        k.      HASSAN KURDI, a purported independent contractor;

        l.      Individual S.C.-A., a purported self-employed individual;

        m.      Thanasis Exotic Rentals Inc;

        n.      Jaber Wholesale Inc.; and

        o.      Second Road Inc.

     5.    It was further part of the scheme that defendants solicited or caused to be solicited other individuals' personal identifying information, such as addresses, birthdates, social security numbers, and bank account information, which

information defendants used to prepare and submit, and to cause others to prepare and submit, false and fraudulent PPP and EIDL applications and supporting documents on behalf of those other individuals in exchange for a share of the approved loans' proceeds.

6. It was further part of the scheme that, in exchange for obtaining fraudulent PPP and EIDL funds for other individuals, defendants knowingly collected and caused others to collect, fees from those other individuals through, among other things, peer-to-peer payment networks, including Zelle and Apple Cash.

7. It was further part of the scheme that defendants misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

### *The PPP Loans*

8. It was further part of the scheme that the defendants and others, prepared and submitted, and caused to be prepared and submitted, to loan service providers and lenders, including Loan Service Providers and the Lenders, PPP loan applications on behalf of certain purported entities, in which applications the defendants falsely and fraudulently represented that the purported entity was a business that employed a specified number of employees, paid a specified average monthly payroll, and was in operation on February 15, 2020, and that all PPP loan proceeds would be used only for business related purposes. Defendants knew at the time that those statements were false, that the purported entities had no income or

payroll and were not in operation on February 15, 2020, and that the defendants intended to use the loan funds for their personal use and benefit.

9.      It was further part of the scheme that, to substantiate the number of employees and payroll of the purported entities, the defendants prepared and submitted, and caused to be prepared and submitted, to the Lenders and Loan Service Providers copies of false IRS tax filings (including IRS Form 1040, Schedule C) that fraudulently represented that the purported entities had earned income in the tax year 2019. Defendants knew at the time that the purported entities had earned no income for which federal taxes were paid during that period.

10.      It was further part of the scheme that, through the submission of the false and fraudulent PPP loan applications, defendants, and others, caused the Lenders to disburse millions of dollars in PPP loan proceeds into bank accounts, including bank accounts that the defendants controlled.

11.      It was further part of the scheme that defendants, and others, used the PPP funds that the Lenders disbursed based on the fraudulent PPP applications to make cash withdrawals, to purchase goods and services, including luxury vehicles and watches, and to transfer funds between various accounts that they controlled, all for their personal use and benefit.

### *The EIDL Loans*

12.      It was further part of the scheme that the defendants prepared, and submitted, and caused to be prepared to submitted to the SBA, numerous

11

applications for EIDL loans and advances on behalf of several of the purported entities in which applications they made false statements regarding the dates on which those entities opened for business, the entities' gross revenues and costs of goods sold for the 12 months prior to January 31, 2020, and the number of employees employed by those entities as of January 31, 2020.

13.     It was further part of the scheme that defendants knowingly solicited other individuals to take part in the scheme to fraudulently obtain EIDL loan funds.

14.     It was further part of the scheme that, through the submission of the false and fraudulent EIDL loan applications, defendants caused the SBA to disburse approximately millions of dollars in EIDL loan proceeds into bank accounts, including bank accounts that they controlled.

15.     It was further part of the scheme that the defendants used the EIDL funds obtained through their submission of fraudulent EIDL applications to make cash withdrawals and transfers, all for their personal use and benefit, and not for purposes related to the business of the purported entities.

16.     On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants, as set forth below, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means

of wire communication in interstate commerce certain writings, signs, and signals, listed below, each constituting a separate count:

| Count | Defendants | Date | Description of Act |
|-------|-----------|------|--------------------|
| One | GEORGE KAVROULAKIS | July 14, 2020 | an interstate wire transmission of $10,000 from the SBA to a Byline Bank account ending in 8773, which funds represented the proceeds of an EIDL advance to the sole proprietorship in the name of K.K. |
| Two | HASSAN KURDI | July 14, 2020 | an interstate wire transmission of $56,200 from the SBA to a Huntington Bank account ending in 8840, which funds represented the proceeds of an EIDL to independent contractor "HASSAN KURDI" |
| Three | GEORGE KAVROULAKIS | July 15, 2020 | an interstate wire transmission of approximately $20,100, from Cross River Bank to a Discover account ending in 4779, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of "GEORGE KAVROULAKIS" |
| Four | ATHANASIOS INTZES, a/k/a "Tommy," and GEORGE KAVROULAKIS | September 9, 2020 | an interstate wire transmission of $114,900 from the SBA to a PenFed account ending in 4021, which funds represented the proceeds of an EIDL to the S-Corporation "Thanasis Exotic Rentals Inc" |
| Five | ADAM JABER and GEORGE KAVROULAKIS | September 15, 2020 | an interstate wire transmission of $89,900 from the SBA to a BMO Harris account ending in 8097, which funds represented the proceeds of an EIDL to the S-Corporation "Jaber Wholesale Inc." |

| Count | Defendants | Date | Description of Act |
|---|---|---|---|
| Six | HASSAN KURDI | February 9, 2021 | an interstate wire transmission of approximately $20,185 from Cross River Bank to a J.P. Morgan Chase Bank account ending in 9631, which funds represented the proceeds of a PPP loan to the self-employed individual S.C.-A. |
| Seven | ADAM JABER | February 23, 2021 | an interstate wire transmission of approximately $20,312.50 from Itria Ventures to a BMO Harris account ending in 8097, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of "ADAM JABER" |
| Eight | ADAM JABER | February 24, 2021 | an interstate wire transmission of approximately $20,000 from Itria Ventures to a BMO Harris account ending in 1850, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of E.G. |
| Nine | HASSAN KURDI | February 24, 2021 | an interstate wire transmission of approximately $20,165 from Itria Ventures to a Huntington Bank account ending in 8840, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of "HASSAN KURDI" |
| Ten | GEORGE KAVROULAKIS | March 10, 2021 | an interstate wire transmission of $20,187 from Itria Ventures to a Chime bank account ending in 9741, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of "GEORGE KAVROULAKIS" |

14

| Count | Defendants | Date | Description of Act |
|-------|-----------|------|--------------------|
| Eleven | ATHANASIOS INTZES, a/k/a "Tommy," and GEORGE KAVROULAKIS | April 1, 2021 | an interstate wire transmission of approximately $20,207 from Capital Plus Financial to a Chime account ending in 7620, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of "ATHANASIOS INTZES" |
| Twelve | ABDALLAH ISSA | April 2, 2021 | an interstate wire transmission of $20,165 from Capital Plus Financial to a Bluevine account ending in 0954, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of M.A. |
| Thirteen | ATHANASIOS INTZES, a/k/a "Tommy," and ABDALLAH ISSA | April 29, 2021 | an interstate wire transmission of approximately $20,165 from Capital Plus Financial to a J.P. Morgan Chase Bank account ending in 2093, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of D.P. |
| Fourteen | HASSAN KURDI | May 11, 2021 | an interstate wire transmission of $20,165 from Prestamos CDFI, LLC to a Capital One, N.A. bank account ending in 9098, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of "HASSAN KURDI" |
| Fifteen | ATHANASIOS INTZES, a/k/a "Tommy" and ABDALLAH ISSA | May 13, 2021 | an interstate wire transmission of approximately $19,930 from Cross River Bank to a J.P. Morgan Chase Bank account ending in 7127, which funds represented the proceeds of a PPP loan to a sole proprietorship in the name of V.M. |

| Count | Defendants | Date | Description of Act |
|-------|-----------|------|--------------------|
| Sixteen | ABDALLAH ISSA | May 20, 2021 | an interstate wire transmission of approximately $20,832 from Capital Plus Financial to a J.P. Morgan Chase Bank account ending in 7094, which funds represented the proceeds of a PPP loan to "Second Road Inc" |

In violation of Title 18, United States Code, Section 1343.

16

## COUNTS SEVENTEEN THROUGH TWENTY-FIVE

The SPECIAL APRIL 2024 GRAND JURY further charges:

17.     Paragraphs 1(b), (o), (p), and (q) of Counts One through Sixteen are incorporated here.

18.     At times material to this indictment:

### *Pandemic Unemployment Assistance*

a.      In 1935, the federal Social Security Act established the dual program of federal and state unemployment benefits. Under the Act, each state administers its own unemployment program through their State Workforce Agency, within the guidelines of federal law. The state unemployment benefits are financed in part by state payroll taxes, which are held in trust by the United States Treasury's Federal Unemployment Trust Fund. During periods of high unemployment, the federal government has also funded or augmented state unemployment benefits.

b.      The CARES Act also expanded individual states' ability to provide assistance to workers impacted by COVID-19, including for workers who were not ordinarily eligible for unemployment insurance benefits. One of the temporary programs established by the CARES Act is Pandemic Unemployment Assistance ("PUA").

c.      PUA provided for benefits to individuals who were: (1) self-employed, seeking part-time employment, or otherwise would not qualify for regular unemployment insurance or extended benefits under state or federal law or Pandemic

17

Emergency Unemployment Compensation; and (2) unemployed, partially unemployed, unable to work, or unavailable to work due to specific COVID-19 related reason(s).

       d.    Under the PUA provisions of the CARES Act, business owners, self-employed workers, independent contractors, and gig workers qualified for PUA benefits administered by the State Workforce Agency if they previously performed such work and were unemployed, partially unemployed, unable to work or unavailable to work due to a COVID-19 related reason.

       e.    PUA claimants were required to answer specific questions related to their eligibility, and to provide their name, Social Security Number, and mailing address. Claimants were also required to self-certify that they met one of the COVID-19 related reasons for being unemployed, partially unemployed, or unable or unavailable to work.

       f.    The Illinois Department of Employment Security ("IDES") was the designated State Workforce Agency of the State of Illinois.

       g.    The California Employment Development Department ("CA EDD") was the designated State Workforce Agency of the State of California.

### *The Scheme to Defraud*

     19.    Beginning in or around April 2020 and continuing through to at least in or around September 2021, in the Northern District of Illinois, and elsewhere,

GEORGE KAVROULAKIS,

18

ADAM JABER, and
ATHANASIOS INTZES, a/k/a "Tommy,"

defendants herein, knowingly devised, intended to devise, and participated in a scheme to defraud, and to obtain money and property, in connection with applications for PUA funds, by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

20. It was part of the scheme that defendants prepared and submitted, and caused to be prepared and submitted, to the IDES applications for unemployment insurance and PUA on behalf of themselves and others, which applications contained materially false statements and misrepresentations, including that claimants had recently worked for a specific employer and were unemployed as a result of the COVID-19 pandemic. Defendants knew at the time that the claimants had not recently worked for those employers and were not unemployed as a result of the COVID-19 pandemic.

21. It was further part of the scheme that defendants prepared and submitted, and caused to be prepared and submitted, to the CA EDD applications for PUA on behalf of themselves and others, which applications contained materially false statements and misrepresentations, including that claimants lived and had worked in California and were unemployed as a result of the COVID-19 pandemic. Defendants knew at the time that the claimants did not live and had not worked in California and were not unemployed as a result of the COVID-19 pandemic.

19

22.     It was further part of the scheme that the defendants submitted and caused to be submitted to the IDES and CA EDD fraudulent documents, including fraudulent statements of earnings and false IRS Form 1040, Schedules C, knowing that these documents were false and fraudulent.

23.     It was further part of the scheme that, through the submission of the false and fraudulent PUA applications, defendants caused the disbursement of more than at least approximately $750,000 in PUA benefits to claimants who, as defendants knew, were not entitled to such benefits.

24.     It was further part of the scheme that the defendants caused the disbursement of PUA benefits to bank accounts and debit cards that they controlled, and used the funds for their personal use and benefit.

25.     It was further part of the scheme that the defendants misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

26.     On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants, as set forth below, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals,

namely, internet transmissions of applications for PUA funds, listed below, each

constituting a separate count:

| Count | Defendants | Date | Description of Act |
|-------|-----------|------|--------------------|
| Seventeen | GEORGE KAVROULAKIS | November 30, 2020 | an internet transmission to IDES of an application for PUA funds in the name of E.G., through servers located outside of Illinois |
| Eighteen | GEORGE KAVROULAKIS | February 7, 2021 | an internet transmission to IDES of a fictitious statement of earnings in support of continued receipt of PUA funds in the name of GEORGE KAVROULAKIS, through servers located outside of Illinois |
| Nineteen | ATHANASIOS INTZES, a/k/a "Tommy" and GEORGE KAVROULAKIS | February 7, 2021 | an internet transmission to IDES of a fictitious statement of earnings in support of continued receipt of PUA funds in the name of ATHANASIOS INTZES, through servers located outside of Illinois |
| Twenty | ADAM JABER | July 14, 2021 | an internet transmission to CA EDD of an application for PUA funds in the name of ADAM JABER, through servers located outside of Illinois |
| Twenty-One | ADAM JABER | August 6, 2021 | an internet transmission to CA EDD of an application for PUA funds in the name of P.M., through servers located outside of Illinois |
| Twenty-Two | ADAM JABER | August 6, 2021 | an internet transmission to CA EDD of an application for PUA funds in the name of P.K., through servers located outside of Illinois |

| Count | Defendants | Date | Description of Act |
|---|---|---|---|
| Twenty-Three | ADAM JABER | August 6, 2021 | an internet transmission to CA EDD of an application for PUA funds in the name of R.K., through servers located outside of Illinois |
| Twenty-Four | ADAM JABER | August 12, 2021 | an internet transmission to CA EDD of an application for PUA funds in the name of S.C.-A., through servers located outside of Illinois |
| Twenty-Five | ADAM JABER | August 25, 2021 | an internet transmission to CA EDD of an application for PUA funds in the name of T.S.F., through servers located outside of Illinois |

In violation of Title 18, United States Code, Section 1343.

## **FORFEITURE ALLEGATIONS**

The SPECIAL APRIL 2024 GRAND JURY further alleges:

1.      Upon conviction of an offense in violation of Title 18, United States Code, Sections 1343 as set forth in this Indictment, defendants shall forfeit to the United States of America any property which constitutes and is derived from proceeds traceable to the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.      The property to be forfeited includes, but is not limited to:

a.      a personal money judgment in an amount equal to the proceeds derived from the offenses in violation of Title 18, United States Code, Section 1343;

b.      a White 2020 Mercedes-Benz G Class, VIN: W1NYC7HJ9LX358346;

c.      a White 2020 Mercedes-Benz G Class, VIN: W1NYC7HJXLX364558;

d.      a White 2015 Mercedes-Benz S Class, VIN: WDDUG8FB5FA189239;

e.      Rolex Submariner 41 mm Watch, Serial Number Z73929P3.

3.      If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been

23

commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).

A TRUE BILL:

_____

FOREPERSON

_____

Signed by MICHELLE PETERSEN, on behalf of the
UNITED STATES ATTORNEY

24